## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## EASTERN DIVISION

CHRISTINA M. HEINS,

                Claimant,

vs.

ANDREW M. SAUL,
Commissioner of Social Security,

                Defendant.

No. 19-CV-2043-LTS

**REPORT AND RECOMMENDATION**

_____

      Plaintiff Christina M. Heins ("Claimant") seeks judicial review of a final decision of the Commissioner of Social Security ("the Commissioner") denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. Sections 401-34 and supplemental security income benefits ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. Sections 1381-85. Claimant contends that the Administrative Law Judge ("ALJ") erred in determining that she was not disabled. For the reasons that follow, I recommend that the District Court **affirm in part and reverse and remand in part** the Commissioner's decision.

## I.    BACKGROUND

      I adopt the facts set forth in the Parties' Joint Statement of Facts (Doc. 11) and only summarize the pertinent facts here. This is an appeal from a denial of both DIB and SSI. Claimant was born on July 23, 1975. (AR[1] at 287.) Claimant is a high school

_____

[1] "AR" cites refer to pages in the Administrative Record.

graduate. (*Id.* at 316.) She allegedly became disabled due to a back injury and three herniated discs, depression, lumbar/sac disc degeneration, sacroiliitis, lumbago, myalgia, myositis, chronic migraines, chronic pain, and fibromyalgia. (*Id.* at 315.) Claimant's onset of disability date was March 1, 2016. (*Id.* at 287.) Claimant filed applications for SSI and DIB on June 2, 2016. (*Id.* at 55.) Her claims were denied originally and on reconsideration. (*Id.* at 189-97, 204-15.) A video hearing was held on September 5, 2018 with Claimant and her attorney, Corbett Luedeman, in Waterloo, Iowa and ALJ John Priester and Vocational Expert Jeff Johnson in West Des Moines, Iowa. (*Id.* at 75-109.) Claimant and the VE testified. (*Id.* at 80-108.) The ALJ issued an unfavorable decision on November 13, 2018. (*Id.* at 55-65.)

Claimant requested review and Appeals Council denied review on May 3, 2019. (*Id.* at 1-5.) Claimant submitted additional evidence with her request for review. (*Id.* at 2.) The Appeals Council determined that medical evidence from Buchanan County Health Center dated September 18 to November 6, 2018 did "not show a reasonable probability that it would change the outcome of the decision." (*Id.*) That evidence was not included as an exhibit in the administrative record. (*Id.*) Evidence from Buchanan County Medical Center dated November 20, 2018 did not relate to the relevant time period, which closed on the date of the ALJ's decision. (*Id.*) Accordingly, the ALJ's decision stands as the final administrative ruling in the matter and became the final decision of the Commissioner. *See* 20 C.F.R. § 416.1481.

On July 12, 2019, Claimant timely filed her complaint in this Court. (Doc. 4.) On February 18, 2020, all briefing was completed. On April 9, 2020, the Honorable Leonard T. Strand referred the case to me for a Report and Recommendation.

## II.    *DISABILITY DETERMINATIONS AND THE BURDEN OF PROOF*

A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant has a disability when, due to physical or mental impairments, the claimant

> is not only unable to do [the claimant's] previous work but cannot, considering [the claimant's] age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). A claimant is not disabled if the claimant is able to do work that exists in the national economy but is unemployed due to an inability to find work, lack of options in the local area, technological changes in a particular industry, economic downturns, employer hiring practices, or other factors. 20 C.F.R. § 404.1566(c).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows the five-step sequential evaluation process outlined in the regulations. *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). At steps one through four, the claimant has the burden to prove he or she is disabled; at step five, the burden shifts to the Commissioner to prove there are jobs available in the national economy. *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009).

At step one, the ALJ will consider whether a claimant is engaged in "substantial gainful activity." *Id.* If so, the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i). "Substantial activity is significant physical or mental work that is done on a full- or part-time basis. Gainful activity is simply work that is done for compensation." *Dukes v. Barnhart*, 436 F.3d 923, 927 (8th Cir. 2006) (citing *Comstock v. Chater*, 91 F.3d 1143, 1145 (8th Cir. 1996); 20 C.F.R. § 416.972(a),(b)).

If the claimant is not engaged in substantial gainful activity, at step two, the ALJ decides if the claimant's impairments are severe. 20 C.F.R. § 416.920(a)(4)(ii). If the

3

impairments are not severe, then the claimant is not disabled. *Id.* An impairment is not severe if it does not significantly limit a claimant's "physical or mental ability to do basic work activities." *Id.* § 416.920(c). The ability to do basic work activities means the ability and aptitude necessary to perform most jobs. *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987) (quoting 20 C.F.R. §§ 404.1521(b), 416.921(b)). These include

> (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.

*Id.* (quotation omitted) (numbers added; internal brackets omitted).

If the claimant has a severe impairment, at step three, the ALJ will determine the medical severity of the impairment. 20 C.F.R. § 416.920(a)(4)(iii). If the impairment meets or equals one of the impairments listed in the regulations ("the listings"), then "the claimant is presumptively disabled without regard to age, education, and work experience." *Tate v. Apfel*, 167 F.3d 1191, 1196 (8th Cir. 1999) (quotation omitted).

If the claimant's impairment is severe, but it does not meet or equal an impairment in the listings, at step four, the ALJ will assess the claimant's residual functional capacity ("RFC") and the demands of the claimant's past relevant work. 20 C.F.R. § 416.920(a)(4)(iv). RFC is what the claimant can still do despite his or her limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing 20 C.F.R. §§ 404.1545(a), 416.945(a)). RFC is based on all relevant evidence and the claimant is responsible for providing the evidence the Commissioner will use to determine the RFC. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). "Past relevant work" is any work the claimant performed within the fifteen years prior to his application that was substantial gainful activity and lasted long enough for the claimant to learn how to do it.

4

20 C.F.R. § 416.960(b)(1).  If a claimant retains enough RFC to perform past relevant work, then the claimant is not disabled.  *Id.* § 416.920(a)(4)(iv).

At step five, if the claimant's RFC will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to show there is other work the claimant can do, given the claimant's RFC, age, education, and work experience. *Id.* §§ 416.920(a)(4)(v), 416.960(c)(2).  The ALJ must show not only that the claimant's RFC will allow the claimant to do other work, but also that other work exists in significant numbers in the national economy.  *Eichelberger*, 390 F.3d at 591 (citation omitted).

## A.     *The ALJ'S Findings*

As a threshold issue, the ALJ determined that Claimant met the insured status requirements of the Social Security Act through March 31, 2018.  (AR at 58.)  The ALJ then made the following findings at each step of the five-step process regarding Claimant's disability status.

At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since her alleged onset of disability date of March 1, 2016.  (*Id.*)

At step two, the ALJ found that Claimant suffered from the following severe impairments: dysfunction of major joints, migraines, spine disorder, affective disorder, and organic mental disorder. (*Id.*)  The ALJ found Claimant's asthma and gastrointestinal disorders to be nonsevere impairments.  (*Id.*) The ALJ noted that although Claimant claimed to be limited due to fibromyalgia, it did not appear that she was "properly diagnosed with a tender point examination." (*Id.*)

At step three, the ALJ found that Claimant did not have an impairment or combination of impairments that met or equaled a presumptively disabling impairment listed in the regulations, either when considered singly or in combination.  (*Id.*)

5

The ALJ evaluated Claimant's claims under listings 1.02 (major disfunction of a joint due to any cause); 1.04 (disorders of the spine), 11.02 (epilepsy), 12.04 (depressive, bipolar and related disorders), and 12.11 (neurodevelopmental disorders). (*Id.*)

At step four, the ALJ found that Claimant had the following RFC:

[T]he claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she can never reach overhead on the right. She can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. However, the claimant could never climb ladders, ropes, or scaffolds. Further, she can occasionally work at unprotected heights; occasionally work with moving mechanical parts; and occasionally work around humidity and wetness. Similarly, she can occasionally work around dust, odors, fumes, and pulmonary irritants as well as occasionally work around extreme cold and vibration. In addition, she would be limited to performing simple, routine, tasks.

(*Id.* at 59.) The ALJ further found Claimant was unable to perform any of her past relevant work. (*Id.* at 63.)

At step five, the ALJ found there were jobs that existed in significant numbers in the national economy that Claimant could perform, including surveillance systems monitor, document preparer, and addresser. (*Id.* at 64.) Therefore, the ALJ concluded that Claimant was not disabled. (*Id.* at 65.)

## B.    *The Substantial Evidence Standard*

The ALJ's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Moore*, 572 F.3d at 522. "The phrase 'substantial evidence' is a 'term of art' used throughout administrative law. . . . [T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations and quotations omitted). The court cannot disturb an ALJ's decision unless it falls outside this available "zone of

choice" within which the ALJ can decide the case. *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) (citation omitted). The decision is not outside that zone of choice simply because the court might have reached a different decision. *Id.* (citing *Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001)); *Moore*, 572 F.3d at 522 (holding that the court cannot reverse an ALJ's decision merely because substantial evidence would have supported an opposite decision).

In determining whether the Commissioner's decision meets this standard, the court considers all the evidence in the record, but does not reweigh the evidence. *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). A court considers both evidence that supports the ALJ's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [ALJ's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

## III. DISCUSSION

Claimant alleges the ALJ committed reversible error by (A) not recognizing and obtaining an explanation for the inconsistencies between the VE's jobs that require frequent reaching and the RFC limitation to no overhead reaching with Claimant's dominant arm, (B) failing to provide good reasons for the weight afforded to Dr. Conditt's opinion, and (C) failing to provide good reasons for his credibility determinations. Claimant further argues the ALJ was not appointed in a constitutional manner. Thus, she argues the ALJ's decision must be vacated and Claimant's case remanded so a properly-appointed ALJ may adjudicate the claim.

### A. The ALJ erred by adopting jobs in the national economy that Claimant could not perform.

The relevant part of the RFC states, "the claimant . . . can never reach overhead on the right." (AR at 59.) Claimant argues that the ALJ did not properly explain the inconsistencies between two of the jobs the VE proffered and that the ALJ relied on to deny benefits because the jobs required overhead reaching. Claimant also argues that the job remaining after the reaching jobs are removed from the total number of jobs is inappropriate for Claimant because it requires a reasoning level that is too high for Claimant.[2] She further argues that when the inappropriate reaching jobs are removed from the total, the number of jobs the ALJ relied on to deny benefits may not be a significant number of jobs.

#### 1. Reaching Requirement

> When obtaining VE testimony, the ALJ must "ask about any possible conflict" between the VE's testimony and "information in the *DOT* [(Dictionary of Occupational Titles)]." SSR 00-4p, 2000 WL 1898704, at *4 (Dec. 4, 2000). When a conflict exists, the ALJ has an "affirmative responsibility" to ask about the conflict and receive an explanation. *Welsh v. Colvin*, 765 F.3d 926, 929 (8th Cir. 2014). "Neither the *DOT* nor the VE . . . evidence automatically 'trumps'" the other, though a VE's explanation adequately resolves a conflict if it "is reasonable and provides a basis for relying on the VE . . . testimony rather than on the *DOT* information." SSR 00-4p, 2000 WL 1898704 at *2. If conflicts between VE testimony and the *DOT* are not resolved, then the VE testimony "does not constitute substantial evidence upon which the Commissioner may rely." *Kemp v. Colvin*, 743 F.3d 630, 632 (8th Cir. 2014).

*Block v. Saul*, No. C18-118-LTS, 2020 WL 1505566, at *7 (N.D. Iowa Mar. 30, 2020) (all alterations in original, except brackets). For Social Security disability purposes,

---

[2] Claimant also argues that one of the reaching jobs requires a reasoning level that is too high for Claimant.

"reaching" means "extending the hands and arms in any direction." *Kemp ex. rel Kemp v. Colvin*, 743 F.3d 630, 632 (8th Cir. 2014) (quoting *Selected Characteristics of Occupations*, App. C).

Claimant argues that two of the jobs the ALJ relied on to deny benefits at step five of the sequential evaluation process required frequent reaching per the *DOT*: document preparer—*DOT* number 249.587-018, 1991 WL 672349 and addresser—*DOT* number 209.587-010, 1991 WL 671797. (Doc. 12 at 4.) Claimant avers that "given the apparent unresolved conflict between the reaching requirements of two of the jobs the ALJ relied on to deny benefits and Ms. Heins' dominant arm overhead reaching limitation," substantial evidence does not support the ALJ's decision. (*Id.*)

The Commissioner responds that sedentary jobs are usually performed while sitting, and therefore usually involve little, if any, overhead reaching. (Doc. 13 at 4.) The Commissioner further argues that "[a] limitation only on overhead reaching for one arm does not create a direct conflict with the [*DOT*] for Addresser and Document Preparer because the [*DOT*] does not mention overhead reaching for either job." (*Id.* at 5 (citing *Goodman v. Colvin*, 2016 WL 4190738, at *15 (D. Ariz. Aug. 9, 2016).) According to the Commissioner, "when a job requires overhead reaching, the [*DOT*] generally explicitly mentions that demand." (*Id.* (citing *Goodman*, 2016 WL 4190738, at *15; *Dickmeier v. Comm'r of Soc. Sec. Admin.*, 2015 WL 8514188, at *5 (D. Or. Dec. 11, 2015).)

"Under Social Security Ruling (SSR) 00–4p, the ALJ must 'ask about any possible conflict' between VE evidence and 'information provided in the *DOT*.'" *Moore v. Colvin*, 769 F.3d 987, 989 (8th Cir. 2014).

> However, the responsibilities of the ALJ do not end there. If there is an "apparent unresolved conflict" between VE testimony and the *DOT*, the ALJ must "elicit a reasonable explanation for the conflict" and "resolve the conflict by determining if the explanation given [by the expert] provides a

> basis for relying on the [VE] testimony rather than on the *DOT* information." SSR 00–4p, 2000 WL 1898704, at *2–4 (Dec. 4, 2000). The ALJ is not absolved of this duty merely because the VE responds "yes" when asked if [his] testimony is consistent with the *DOT*.

*Id.* at 989-90 (all but last alteration in original).

The case at bar is analogous to *Block*, in which the ALJ had to decide if the claimant could perform her past relevant work as a dispatcher as it was generally performed. 2020 WL 1505566, at *8. The hypothetical presented to the VE limited the claimant to "no overhead reaching with her left (dominant) arm." *Id.* at *2. The VE testified that a left-handed person limited to no overhead reaching with the left arm could perform the claimant's past relevant work as a dispatcher as it is generally performed. *Id.* at *8. The *DOT* described the claimant's past relevant work as requiring frequent reaching, which meant reaching exists one-third to two-thirds of the time. *Id.* *Block* recognized that under Social Security regulations, "reaching" means "extending the hands and arms in any direction." *Id.* (quoting *Kemp*, 743 F.3d at 632). The court concluded that "to perform the job of dispatcher, an employee must be able to spend a significant part of the work day 'extending the hands and arms in any direction.'" *Id.* The court held that the ALJ's decision that the claimant could perform her past relevant work as a dispatcher as generally performed was not supported by the record for the following reasons.

> Given this information, the VE's testimony that a claimant who is unable to reach overhead with the claimant's dominant hand can perform the job of dispatcher appears to conflict with the *DOT* description for that job. At minimum, this is a potential conflict that should have been addressed on the record. Based on his training and experience, the VE might well have been able to explain why this is not an actual conflict. Or, at least, the VE may have been able to resolve the conflict. Unfortunately, he was not asked to do so. Even a few additional questions posed by the ALJ could have (a) established that the VE's opinion is consistent with the *DOT*, (b) permitted the VE to explain any inconsistency or, perhaps, (c) alerted the VE that his

10

opinion does not jibe with the *DOT*'s definition. Any of these outcomes would have avoided the current situation, in which the administrative record provides no explanation for a vocational-expert opinion that appears to be inconsistent with the *DOT*.

In short, the ALJ erred by failing to ask the VE if his opinion is consistent with the *DOT*. I cannot find the error to be harmless because there appears to be an actual conflict between the VE's opinion and the *DOT* description of how Block's past relevant work is generally performed.

*Id.* at **8-9.

Just as the hypothetical in *Block* limited the claimant to no overhead reaching with her left dominant arm, the hypothetical in this case limited Claimant to "never reach overhead with her right dominant hand." (AR at 104.) The *DOT* describes both document preparer and addresser as jobs requiring reaching frequently, which means reaching exists one-third to two-thirds of the time, just as the dispatcher job did in *Block*. Under Social Security regulations, "reaching" still means "extending the hands and arms in any direction." *Kemp*, 743 F.3d at 632. Thus, under *Block*, to perform the jobs of addresser and document preparer, "an employee must be able to spend a significant part of the work day 'extending the hands and arms in any direction.'" 2020 WL 1505566, at *8. Here, as in *Block*, the VE's testimony that a claimant who is unable to reach overhead with the claimant's dominant hand can perform the jobs of addresser and document preparer "appears to conflict with the *DOT* description[s] for [those] job[s]. At minimum, this is a potential conflict that should have been addressed on the record. Based on his training and experience, the VE might well have been able to explain why this is not an actual conflict. Or, at least, the VE may have been able to resolve the conflict. Unfortunately, he was not asked to do so." *Id.* Telling the VE before he began testifying to inform the ALJ if his testimony conflicted in any way with the *DOT* and explaining that the VE had an obligation to explain any such conflict did not suffice. (AR at 103.)

11

The ALJ had an affirmative duty to identify the conflict and resolve it. SSR 00-4P ("[O]ur adjudicators must: Identify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs or VSs and information in the *Dictionary of Occupational Titles* (*DOT*). . . ."). The ALJ did not do so.[3]

Therefore, there is an apparent unresolved conflict between the reaching requirements of the jobs of document preparer and addresser the ALJ relied on to deny benefits and Claimant's right arm overhead reaching limitation. Accordingly, substantial evidence does not support the ALJ's decision on this issue and these two jobs must be stricken from the total number of jobs available in the national economy that are available to Claimant.

> ### 2. Reasoning Level of Surveillance System Monitor and Document Preparer Jobs

Claimant argues that the ALJ did not resolve the apparent conflict between her RFC, which limits her to "performing simple, routine, tasks" and the surveillance system monitor and document preparer jobs, which require a reasoning level of three. (Doc. 12 at 6.)

Claimant argues there is a "split" on this issue in this Court. (*Id*.) Claimant cites *Jennings v. Berryhill*, in which Chief Judge Strand accepted the report and recommendation of then-Chief Magistrate Judge Williams that there was an inconsistency between an RFC limiting the claimant to "simple, routine tasks with simple instructions" and a reasoning level 3 job. No. 3:17-cv-03062-LTS, 2018 WL 4107911 at **3-4 (N.D. Iowa August 29, 2018). The report and recommendation ("R. and R.") stated that "[a]lthough this tension is not dispositive of whether claimant is capable of performing the job of document preparer, the ALJ did not attempt to resolve this tension, and the

---

[3] In addition, the VE did not inform the ALJ of the conflict.

record is otherwise unclear as to whether claimant could perform the job of document preparer." *Jennings v. Berryhill*, No. 17-CV-3062-LTS, 2018 WL 3656306, at \*10 (N.D. Iowa Aug. 2, 2018), *R. & R. adopted*, No. C17-3062-LTS, 2018 WL 4107911 (N.D. Iowa Aug. 29, 2018). Therefore, the R. and R. concluded that "there is a possibility that claimant could perform the work of 'document preparer,' but the record is insufficient to determine whether claimant has the requisite reasoning level to perform the job." *Id.* at \*12.

Claimant also cites *Murphy v. Comm'r of Soc. Sec.*, No. 18-CV-61-LRR, 2019 WL 2372896 (N.D. Iowa April 10, 2019), *appeal docketed*, No. 19-2202 (8th Cir. June 12, 2019), *appeal stayed pending disposition of Davis v. Saul,* No.18-3422 & *Hilliard v. Saul*, No. 19-1169 (8th Cir. Nov. 4, 2019), for the other side of the "split." In *Murphy*, the RFC limited the claimant to "simple, routine, and repetitive tasks." 2019 WL 2372896 at \*6. The Honorable Linda R. Reade found, in pertinent part, that jobs requiring level 3 reasoning were not inconsistent with the RFC. *Id.* (citation omitted).

Chief Magistrate Judge Mahoney discussed these two cases in her report and recommendation in *Dighton v. Saul*, No. C18-57-LTS, 2019 WL 4731943 (N.D. Iowa Sept. 27, 2019) (Judge Strand adopting the R. & R. in its entirety). In *Dighton*, the RFC was more multi-faceted than those addressed in *Jennings* and *Murphy*, limiting the claimant, in pertinent part, to work involving "simple, routine and repetitive tasks . . . [with] only simple work-related instructions and decisions, and with only occasional judgment and work place changes." 2019 WL 4731943, at \*\*4-5. Judge Mahoney concluded that it was unclear whether the additional RFC restrictions

> were comparable to the inability to perform complex technical work or to perform simple, non-detailed work, which courts have found are not in conflict with jobs requiring level three reasoning. *Id.* (citing *Renfrow v. Astrue*, 496 F.3d 918, 921 (8th Cir. 2007) and *Filbert v. Colvin*, No. 4:14-cv-00209-JAR, 2015 WL 1474873, at \*9-11 (E.D. Mo. Mar. 31, 2015)). She noted that the limitations taken together plainly exceeded restrictions of

13

"simple, routine and repetitive tasks" or "simple, repetitive tasks"
identified in other cases where courts have concluded such limitations are
consistent with level two and level three reasoning. *Id.* at 14-15 (citing
*Murphy v. Berryhill*, No. 18-CV61-LRR, 2019 WL 2372896, at *6 (N.D.
Iowa Apr. 10, 2019) and *Hamer v. Colvin*, No. 4:14 CV 1371 JMB, 2015
WL 6750820, at *10 (E.D. Mo. Nov. 5, 2015)).

*Id.* at *5. Thus, Judge Mahoney reasoned that the issue appeared "unsettled and whether
an inconsistency exists depends on the facts of each case." *Id.* Judge Mahoney concluded
that any conflict between *DOT* job descriptions and the claimant's RFC was unexplained
and therefore she concluded that the ALJ had relied on his professional knowledge,
training, and experience to address restrictions not addressed in the *DOT*. *Id.* Judge
Mahoney held that merely asking whether the VE's testimony was consistent with the
*DOT* did not address the claimant's ability to perform jobs requiring level 3 reasoning.
*Id.* Because the ALJ failed to address the inconsistency between the claimant's RFC and
reasoning level 3 jobs, and because there was no other evidence in the record such as
past prior work to indicate the claimant could perform those jobs, Judge Mahoney
recommended the case be remanded to resolve the conflict. *Id.* Judge Strand accepted
the R. and R. without modification on clear error review. *Id.* at **6-7.

I agree with *Dighton* that cases must be decided on their facts. *Jennings* addressed
an RFC that limited the claimant to "simple, routine tasks with simple instructions." 2018
WL 4107911 at *3. There is no instructions limitation in Claimant's RFC. *See Smith v.
Saul*, No. 18-CV-78-CJW-MAR, 2020 WL 109797, at *5 (N.D. Iowa Jan. 9, 2020)
(finding it was proper to distinguish *Jennings* from the case at bar because the RFC in
the case at bar did not contain an instructions limitation). The *Dighton* RFC was more
complex than the RFC in this case because it includes task, instruction, judgment, and
workplace change limitations. 2019 WL 4731943, at **4-5. Therefore, these two cases
can be distinguished on their facts.

The *Murphy* RFC, however, is more analogous to the RFC in the instant case. The *Murphy* RFC limited the claimant to "simple, routine, and repetitive tasks" and was consistent with jobs requiring level 3 reasoning.   2019 WL 2372896 at *6.  This RFC is arguably more limited than Claimant's RFC, which does not limit Claimant to "repetitive" tasks.   Thus, finding that Claimant can perform work requiring level 3 reasoning with a less restrictive RFC would be consistent with this precedent.  In addition, it is important to note that *Murphy* is not an outlier.  If the proper explanation is provided at the hearing and inconsistencies are explained by the VE, "[t]he weight of authority in this circuit holds . . . that a [sic] RFC limiting a claimant to simple, repetitive tasks does not conflict with a finding that a claimant can perform a job requiring a reasoning level of three." *Gustafson v. Astrue*, No. CIV. 10-4962 DSD/LIB, 2011 WL 6219641, at *8 (D. Minn. Nov. 29, 2011) (citing *Hillier v. Soc. Sec. Admin.,* 486 F.3d 359, 367 (8th Cir. 2007); *Renfrew v. Astrue,* 496 F.3d 918, 921 (8th Cir. 2007)), *R. & R. adopted*, No. CIV. 10-4962 DSD/LIB, 2011 WL 6218211 (D. Minn. Dec. 14, 2011); *see also Hart v. Soc. Sec. Admin.*, No. 5:18-CV-137-JM-BD, 2019 WL 1412108, at **1, 4-5 (E.D. Ark. Mar. 28, 2019), *R. & R. adopted*, No. 5:18CV00137 JM/BD, 2019 WL 1767561 (E.D. Ark. Apr. 22, 2019); *Martin v. Berryhill*, No. 4:16-CV-00978-DGK-SSA, 2017 WL 3704602, at **2, 5 (W.D. Mo. Aug. 28, 2017); *Bolar v. Colvin*, No. 3:15CV00386-JTR, 2016 WL 6900793, at ** 2-3 (E.D. Ark. Nov. 22, 2016).

However, the facts of this case include Claimant's work history.  The ALJ noted that Claimant had past relevant work as a nurse aide, home health aide, telephone solicitor, and teacher aide II.  (AR at 63.)  The VE testified that Claimant was unable to

do her past relevant work.  (*Id.* at 105.)  The VE did not specify if Claimant could not do the work because of physical issues, mental issues, or both.  (*Id.*)[4]

The Commissioner argues that because Claimant's past relevant work was semi-skilled and had a reasoning level of 3[5] and because Claimant has not demonstrated that her abilities have "declined from the time she did semi-skilled work such that she could not undertake even unskilled employment," the ALJ's decision should be affirmed.  (Doc. 13 at 11.)

*Hillier v. Soc. Sec. Admin.* reasoned that cases are not decided in the abstract. 486 F.3d 359, 367 (8th Cir. 2007).  *Hillier* held that a claimant who could only understand, remember, and follow simple, concrete instructions could still perform the job of cashier, which required level 3 reasoning, because the claimant had successfully been employed as a cashier in the past and did not assert any intellectual decline since that time.  *Id.; see also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 979 (8th Cir. 2003) (relying on claimant's work history that included working at jobs with equally high SVP ratings as those cited by the VE).  Reasoning Development Levels 1-3 are described below:

- Level 1:  Apply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.
- Level 2:  Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations.

---

[4] The ALJ found she was unable to do her past work due to the physical demands of the jobs. (AR at 63.)

[5] Nurse Assistant—*DOT* number 355.674-014, 1991 WL 672944 (reasoning level 3); Home Attendant—*DOT* number 354.377-014, 1991 WL 672933 (reasoning level 3); Telephone Solicitor—*DOT* number 299.357-014, 1991 WL 672624 (reasoning level 3); Teacher Aide II—*DOT* number 249.367-074, 1991 WL 672337 (reasoning level 3).

16

- Level 3: Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations.

*DOT*, App. C, https://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC. HTM.

The Commissioner notes that both the document preparer and surveillance system monitor jobs are considered unskilled under SSA regulations. (Doc. 13 at 9.) The Commissioner argues that Claimant's RFC is compatible with level 3 reasoning because Claimant "has not proven any impairment in her ability to apply commonsense understanding to unskilled work with simple duties." (*Id.*) The Commissioner further argues that the jobs are limited to routine tasks because reasoning level 3 jobs limit claimants to working in "standardized situations." (*Id.* at 9-10.) The Commissioner explains, "The routine nature is reinforced by the R3 limit to, at most, 'several' variables. 'Several' means more than two but not many." (*Id.* at 10) (citing https://www.merriamwebster.com/ dictionary/several).)

> While the *DOT*'s definition of level three reasoning also mentions potentially dealing with problems involving *several* concrete variables, the dictionary defines several as an indefinite number that is more than two and fewer than many.

(Doc. 13 at 18-19 (citing https://www.merriam-webster.com/dictionary/several) (emphasis in original).)

The Commissioner's argument fails for two reasons. First, the definition of "few," which is part of the definition of level 2 reasoning, is "not many but more than one." https://www.dictionary.com/browse/few?s=t. On a continuum from level 1 to level 3, "several" would logically encompass larger numbers than "few," and "few" seems to logically occupy the space after "one" in the hierarchy. Adopting the

Commissioner's definition leaves "few" being synonymous with only the number "two," which is illogical.

Second, and more importantly, the VE in this case did not resolve the apparent conflict between Claimant's ability to only perform simple, routine, tasks and jobs requiring level 3 reasoning. Examining consulting psychiatrist Paul M. Conditt, Psy.D., opined that Claimant had moderate impairment to her ability to understand instructions, procedures, and locations due to concentration problems. (AR at 795.)[6] He also found she had marked impairment in her ability to carry out instructions due to poor concentration. (*Id.*) Claimant did poorly on the concentration and attention tests Dr. Conditt administered, only answering one-third of the questions correctly. (*Id.* at 794.) Although the state agency consultants concluded that Claimant had the ability to "perform[] 3-4 step tasks in a routine setting when motivated to do so," they also found her moderately limited in her ability to carry out detailed instructions and to concentrate, persist, and to maintain pace, and noted that "Claimant may struggle with concentration and pace according to the variability of her mood." (*Id.* at 125-26, 159, 164-66.) Claimant's family gets frustrated with her because she repeats herself and needs reminders. (*Id.* at 794.) Claimant uses sticky notes to remind her of even routine events. (*Id.*) Claimant testified that her forgetfulness feels like Alzheimer's to her. (*Id.* at 97.) Real tension exists between the mental abilities of the worker described above and a worker expected to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form [and deal] with problems involving several concrete variables in or from standardized situations" as is required for reasoning

---

[6] The ALJ took issue with Dr. Conditt's opinion because he found Dr. Conditt "exceeded his area of expertise and considered the claimant's physical impairments when offering limitations" and he found Dr. Conditt relied on Claimant's own self-reported limitations. (AR at 62.) He therefore assigned Dr. Conditt's opinion only limited weight. (*Id.*) As will be discussed in part III.B, *infra*, I find the ALJ erred in his analysis of Dr. Conditt's opinion.

level 3 jobs. *See Hillier*, 486 F.3d at 367 (holding that a level 3 job was appropriate when the claimant did not have mental decline since performing a level 3 job, even though tension existed "in the abstract").

On remand, the ALJ may well conclude that Claimant can perform jobs requiring level 3 reasoning. Case law shows that claimants are often found capable of doing so. However, claimants are only found capable of doing so after courts are satisfied that the ALJs have obtained testimony that resolves any apparent conflicts. Therefore, even if the District Court does not agree that the document preparer job is inappropriate based on the reaching requirement, I recommend finding that it and the surveillance system monitor job may be inappropriate based on the reasoning level of the jobs and remanding for the ALJ to obtain testimony to resolve the apparent conflict between Claimant's mental capabilities and reasoning level 3 jobs.

### 3.       *Number of Surveillance System Monitor Jobs*

Claimant next argues that, assuming the Court agrees that the document preparer and addresser jobs are inappropriate for her, the remaining 5345 system surveillance system monitor jobs may not be a significant number of jobs in the national economy. (Doc. 12 at 5.)[7]

---

[7] The Commissioner's entire argument related to the number of surveillance system monitor jobs follows:

> Plaintiff builds a house of cards when she asserts the ALJ did not find a substantial number of jobs available in the national economy ("substantial number"). *See* Pl. Br. at 7-10. The ALJ determined that plaintiff was a candidate for over 55,000 jobs, which is a substantial number. (Tr. 64). *See Johnson v. Chater*, 108 F .3d 178, 180 (8th Cir. 1997) (10,000 national jobs was significant). Plaintiff's point of error depends on her unsupported claims about bilateral reaching overhead and jobs with R3 demands. As discussed, neither argument is persuasive.

(Doc. 13 at 12.)

Work exists in significant numbers in the national economy when it "exists in significant numbers either in the region where [the claimant] lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A). It does not matter if work "exists in the immediate area in which [the claimant] lives, or whether a specific job vacancy exists for [the claimant], or whether [the claimant] would be hired if he [or she] applied for work." *Id*. The determination of whether the Commissioner has satisfied the significant numbers requirement is "[left] to the trial judge's common sense application of the . . . requirement to a particular claimant's factual situation." *Hall v. Chater*, 109 F.3d 1255, 1259 (8th Cir. 1997). Claimant admits that the Eighth Circuit has not identified a definitive number of jobs that constitutes the lower threshold for a significant number of jobs in the national economy. (Doc. 12 at 7.)

Claimant cites *Johnson v. Chater*, which held that the Commissioner met her burden of showing there was a significant number of jobs in the national economy because one job had 200 positions in Iowa and 10,000 nationally. 108 F.3d 178, 180 (8th Cir. 1997).[8] Claimant distinguishes *Johnson* and other cases from the case at bar because in *Johnson* and the other cases, the VE gave state or regional job numbers in place of or in addition to national job numbers. (Doc. 12 at 8 (also citing *Weiler v. Apfel*, 179 F.3d 1107 (8th Cir. 1999); *Welsh v. Colvin*, 765 F.3d 926, 930 (8th Cir. 2014).) Cases that

---

[8] Claimant also cites *Anderson v. Comm'r, Soc. Sec.*, No. 18-cv-24-LRR-KEM, 2019 WL 1212127 (N.D. Iowa Feb. 19, 2019) and states that the case held "8,112 was not clearly a significant number of jobs to make the SSR 00-4p errors harmless." (Doc. 12 at 9.) The citation Claimant provides is to the District Court's order in the case. The order does not address the issue for which Claimant cites the case. The unpublished report and recommendation, available only via Pacer or the Court's ECF system, addresses this issue and contains the language Claimant quotes. In her report and recommendation in *Anderson*, Chief Magistrate Judge Mahoney opined that "[d]istrict courts in the Eighth Circuit have found *Johnson* to stand for the proposition that 200 jobs in a state constitutes a significant number of jobs in a region, but courts have suggested that 200 is about the threshold." R. & R. at 19, *Anderson v. Comm'r of Soc. Sec.*, No. 18-CV-24-LRR (N.D. Iowa Jan. 25, 2019) (Doc. 20).

turn on the number of jobs available statewide or region-wide are not helpful because the only evidence in the case at bar is the number of jobs available in the national economy.

I have not found a case wherein the Eighth Circuit held that a number of jobs in the national economy less than 10,000 was considered a significant number of jobs. However, *Rikard v. Astrue* held that a significant number of jobs existed when 3000 jobs existed nationally. No. 07-3029-CV-S-REL-SSA, 2008 WL 250580, at **5, 27 (W.D. Mo. Jan. 28, 2008). *Rikard*, though, seemed to turn on the number of jobs available statewide (100), rather than nationally, because the cases upon which the court relied were all cases that turned on the number of jobs available state-wide or regionally. *Id.* at *27. I respectfully decline to follow the reasoning of *Rikard* for three reasons. First, the case turned on the number of jobs available regionally, rather than nationally. Thus, the case can be distinguished on that point, and any comparison would not be reasonable. Second, although *Rikard* was decided eleven years after *Johnson*, it does not cite *Johnson* in the relevant part of the opinion, and therefore did not consider this Eighth Circuit precedent. Third, *Rikard* seems to be an outlier among cases that find a small number of jobs in the state or regional economy constitute a significant number of jobs. *Id.* (citing *Trimiar v. Sullivan*, 966 F.2d 1326, 1330 (10th Cir. 1992) (650 to 900 jobs in Oklahoma a significant number of jobs); *Jenkins v. Bowen*, 861 F.2d 1083, 1087 (8th Cir. 1988) (500 jobs in the region a significant number of jobs); *Craigie v. Bowen*, 835 F.2d 56, 58 (3rd Cir. 1987) (200 jobs in the region a significant number of jobs)).

As Judge Mahoney stated in *Anderson*,

[C]ourts have suggested that 200 jobs is about the threshold. *Compare Craigie v. Bowen*, 835 F.2d 56, 58 (3d Cir. 1987) (noting that VE's testimony that "there were about 200 jobs . . . within [claimant's] capabilities in his region" was "a clear indication that there exists in the national economy other substantial gainful work which [claimant] can perform"), *Farnsworth v. Berryhill*, No. CV 16-5228, 2017 WL 3367115, at *5-6 (W.D. Ark. Aug. 4, 2017) (upholding ALJ's determination that a

significant number of jobs existed based on VE's testimony that 294 positions existed in Arkansas and 11,791 existed nationwide, noting national numbers standing alone would be sufficient), *and Zehr v. Astrue*, No. C12-2019, 2013 WL 297948, at \*11 (N.D. Iowa Jan. 24, 2013) (holding that even if the ALJ erred in determining claimant could perform certain jobs, any error was harmless because a job remained with 230 positions in the state of Iowa and 20,000 positions nationally), *with Beltran v. Astrue*, 700 F.3d 386, 390-91 (9th Cir. 2012) (finding 1,680 positions nationally and 135 positions in California not sufficient where the VE could not say whether any positions existed in tri-county area where the claimant resided), *Patton v. Berryhill*, No. CV 10-5016-JLV, 2018 WL 1137057, at \*4, 7, 14 (D.S.D. Feb. 28, 2018) (reversing ALJ's determination that a significant number of jobs existed when the VE testified that 73,330 positions existed nationally and 227 positions existed (combined) in the four-state area where claimant lived; the court also noted the Appeals Council had previously reversed the ALJ's determination that a significant number of jobs existed based on the VE's testimony that 132,000 jobs existed nationally for the claimant and 350 jobs existed in claimant's state), *and Mueller v. Berryhill*, No. 3:17-CV-78, 2018 WL 2296596, at \*5-7 (D.N.D. Feb. 26, 2018) (noting that "[t]he lowest number that the Eighth Circuit has accepted as a significant number of jobs within the claimant's state appears to be 200" and suggesting that 700 positions across four states (including claimant's) and 11,000 positions nationally was not a significant number); *but see Ferro v. Astrue*, No. 10-2190, 2012 WL 3160357, at \*5-6 (W.D. Ark. Aug. 3, 2012) (suggesting that 70 positions in the state of Arkansas would not be a significant number, but implying that 174 jobs available in a region or state might possibly be sufficient based on a reading of *Hall* as upholding "the existence of 122 jobs in Arkansas [as] significant"); *Rikard v. Astrue*, No. 07-3029-CV-S-REL-SSA, 2008 WL 250580, at \*4- 5, \*27 (W.D. Mo. Jan. 28, 2008) (noting that even if ALJ erred in determining claimant could perform certain work, any error was harmless because the remaining position existed in significant numbers as there were 100 positions in the state and 3,000 positions nationwide (the court relied on cases in which a greater number of positions were found to be significant)). It appears most courts that have found fewer than 200 jobs regionally to be a significant number have defined regionally to be a smaller geographic area than the claimant's state (such as the metropolitan area or county where the claimant resides).

*Griffin v. Saul*, No. 18-CV-85-LRR, 2019 WL 8499518, at *8 (N.D. Iowa Nov. 21, 2019) (quoting R. & R. at 19-21, *Anderson v. Comm'r of Soc. Sec.*, No. 18-CV-24-LRR (N.D. Iowa Jan. 25, 2019) (Doc. 20) (brackets and alterations in original)), *R. & R. adopted sub nom. Griffin v. Comm'r of Soc. Sec.*, No. 18-CV-85-LRR, 2020 WL 733886 (N.D. Iowa Feb. 13, 2020).

*R. & R. adopted*, 2019 WL 1212127 (N.D. Iowa Feb. 19, 2019) report and recommendation concluded that 7800 jobs in the national economy was not a significant number of jobs.[9] *Id.* at *9.

I find that 5345 jobs in the national economy is not a significant number of jobs, especially where the number of jobs available in the regional or state economy is unknown. 42 U.S.C. Section 423(d)(2)(A) states that actual job availability is not to be considered and that it makes no difference whether jobs are actually available in the region. However, cases that have found small numbers of jobs "significant" seem to do so, at least in part, where there is evidence that at least some of the jobs are available regionally. In the case at bar, there is no indication where the 5345 surveillance system monitor jobs exist.

Therefore, should the District Court agree with me that the addresser and document preparer jobs are inappropriate, I recommend remanding the case to resolve the issue of job availability.

_____

[9] This is was an alternative holding. The District Court adopted the other recommendations and never reached this issue. *See Griffin v. Comm'r of Soc. Sec.,* No. 18-CV-85-LRR, 2020 WL 733886 (N.D. Iowa Feb. 13, 2020).

**B.** ***The ALJ did not provide good reasons for the weight afforded Dr. Conditt's opinion.***

**1.** ***The Opinion and the Weight Assigned to the Opinion***

Paul M. Conditt, Psy.D., conducted a psychodiagnostic disability examination of Claimant on November 13, 2106 at the request of Disability Determination Services. (AR at 793-95.) Dr. Conditt noted that Claimant "hobbled" into his office and that her chief complaint was "[c]hronic pain plus ruminating on the loss of functioning has created some depression and concentration problems." (*Id.* at 793.)

Under *Pertinent Past History*, Dr. Conditt stated that Claimant "has always been quite active, playing sports in middle school and beyond. She had knee problems starting in middle school for which she had physical therapy." (*Id.*) The rest of the section chronicles Claimant's surgeries and other treatments for physical problems. (*Id.* at 793-94.)

Under *Current Cognitive and Emotional Functioning*, Dr. Conditt noted the following:

> Her mood is depressed, mostly because she is painfully aware of how much functioning she's lost. She mentioned numerous times how she's afraid that, if she feels this bad at age 41, how bad will it be when she gets older? . . . Christina kept emphasizing that she is supposed to be a very active person and she used to enjoy riding motorcycles and doing outdoor activities, such as riding bikes. Her body just cannot tolerate much activity at all and that realization is depressing to her.
>
> She has tremendous difficulty with concentration and attention, probably due to chronic pain plus side effects of pain medications. She wasn't able to repeat digits at all, either forward or backward. She was only able to remember 1/3 items correctly upon delay, requiring a cue both times she was asked. She was able to do simple arithmetic and her answer to similarities were fine. She summarized saying, "This pain is literally driving me to insanity." Later, she explained how her husband and daughter accuse her of repeating herself a lot, and that was quite evident in her answers today. In fact, she repeated the fact that she repeats herself

numerous times. She has trouble remembering what she reads and she has to use sticky notes to remind her of even routine tasks. She described how she'll go into a room and completely forget why she went in. She complained that her husband and daughter realize that she needs constant reminders and it pains her to know this is true.

(*Id.* at 194.)

Dr. Conditt found Claimant was oriented in all spheres; her mood was depressed; and her concentration, memory and attention were "quite poor, probably due to pain and medication side effects." (*Id.* at 795.) He diagnosed her with major depressive disorder, moderate, without psychotic features; mild neurocognitive disorder; and multiple physical health problems. In Dr. Conditt's opinion, Claimant's prognosis was "poor": "Her body is deteriorating at a very young age and this is contributing to worsening depression." (*Id.*) Dr. Conditt had final opinions:

1. As far as ability to understand instruction, procedures and locations, moderate impairment due to attention and concentration problems described above.
2. As far as ability to carry out instructions, maintain concentration and pace, marked impairment due to both physical mobility limitations and poor concentration.
3. As far as ability to interact appropriately with supervisors, co-workers, and the public, moderate impairment due to her repeating herself in conversation, not remembering what she's said already.
4. As far as ability to use good judgment and respond appropriately to changes in the work place, no impairment.
5. As far as ability to handle funds, she is able to manage her own finances.

(*Id.*)

The ALJ gave Dr. Conditt's opinion limited weight because "Dr. Conditt exceeded his area of expertise and considered the claimant's physical impairments when offering limitations. Moreover, it appears that Dr. Conditt relied primarily on the claimant's own self-reported limitations." (*Id.* at 62.)

25

### 2. *Analysis*

Claimant argues that the ALJ should not have assigned only limited weight to this opinion because "these were not sufficient reasons to assign little [sic] weight to Dr. Conditt's opinion." (Doc. 12 at 10.) Moreover, while Claimant admits that a psychologist's opinion regarding physical limitations is not due any special deference, "psychologists can be expected to opine as to how chronic pain impacts a claimant's ability to function mentally." (*Id.* at 10-11.) The Commissioner responds that the ALJ gave Dr. Conditt's opinion the weight it deserved because "[e]very mental limitation Dr. Conditt suggested was premised on his uniformed belief about plaintiff's physical functioning . . . [and] Dr. Conditt seemed to rely on plaintiff's self-reported limitations." (Doc. 13 at 12.) The Commissioner also notes that the ALJ did not "wholly discount" Dr. Conditt's opinion, but did assign it limited weight. (*Id.* at 15.) According to the Commissioner, the ALJ's RFC that included a limitation to "simple, routine tasks," showed the ALJ gave some credit to Dr. Conditt's opinion. (*Id.*)

Psychologists do not render opinions beyond the scope of their expertise when they merely opine as to the *effects* of pain on a claimant's mental health. *Broussard v. Astrue*, No. CIV.A. 08-CV-0651, 2009 WL 4348942 (W.D. La. Nov. 24, 2009), is instructive. In *Broussard*, a consultative psychiatrist opined that a claimant "would have difficulty performing in a reliable and dependable fashion as an employee due to 'the combined negative impact of the mental health issues and chronic pain on his functional capabilities.'" 2009 WL 4348942, at *7. The ALJ held that the opinion was entitled to no weight for the following reasons:

> Though he offered diagnoses related to the claimant's physical condition, these lie outside his area of expertise. Dr. Buxton's opinion that the claimant is unable to work due, at least in part to his physical pain, is not given any weight in this matter, as Dr. Buxton is not qualified to give a medical opinion regarding the claimant's physical impairments and limitations.

*Id.* at *8. The court held the following:

> Dr. Buxton is clearly entitled to opine on the *effects* of chronic pain on Broussard's ability to work. Pain Disorder is an accepted medical diagnosis as recognized by the American Psychiatric Association. *See* The American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (4th Ed. 2005), pps. 458–462. Moreover, as discussed, the evidence of record clearly supports Broussard's complaints of chronic pain. Accordingly, the undersigned finds that the ALJ's decision to give no weight to Dr. Buxton's opinions about the effects of Broussard's chronic pain is not supported by substantial evidence of record.

> As to the effects of his anxiety and depression. Dr. Buxton's opinion that these conditions would preclude him from sustaining work is supported by medical evidence from Dr. Crackower showing that he treated Broussard for anxiety and depression and prescribed psychotropics throughout Broussard's months of treatment.

*Id.* (emphasis added); *Edwards v. Comm'r of Soc. Sec.*, No. 7:17-CV-00052-RN, 2018 WL 1413974, at *8 (E.D.N.C. Mar. 21, 2018) ("The SSA routinely contracts with psychologists . . . along with other mental health professionals, to evaluate a claimant's mental abilities and functional limitations addressing the effect of pain on mental functioning.") (gathering cases); *Bertram v. Colvin*, No. 5:14-CV-109, 2015 WL 4545770, at *14 (D. Vt. July 27, 2015) (holding psychiatrist was "qualified about to make an opinion about how [the claimant's] pain affected his mental functioning and ability to work, particularly given that [the claimant's] depression [was] closely connected with his pain issues"). *Cf. Delrosa v. Sullivan*, 922 F.2d 480, 485–86 (8th Cir. 1991) (remanding case for ALJ to consider possibility that claimant's "perception of pain is exacerbated by his psychological impairment") (citation omitted); *Kristjanson v. Colvin,* No. 16 CV 43 EJM, 2016 WL 6440132, at **1-2 (N.D. Iowa Oct. 28, 2016) (reversing and remanding case, in part, because the ALJ failed to properly weigh treating

psychiatrist's opinion that stated, in part, that the claimant's depression worsened her back and neck pain).

In the case at bar, Dr. Conditt opined for the most part only as to the effect of Claimant's physical impairments and pain on her mental health, which was appropriate. *See Broussard*, 2009 WL 4348942, at *8.[10]  The one opinion that was not appropriate was Dr. Conditt's opinion that Claimant would have marked impairment in her ability to carry out instructions and maintain concentration and pace due to both physical mobility limitations and poor concentration.  Dr. Conditt was not qualified to render an opinion about Claimant's physical mobility limitations. However, because Dr. Conditt also opined that Claimant had poor concentration, it is easy to bifurcate this opinion.  Other than that, Dr. Conditt did not opine as to Claimant's physical limitations.

The ALJ also stated that Dr. Conditt's opinion was only entitled to limited weight because "it appear[ed] Dr. Conditt relied primarily on the claimant's own self-reported limitations."  (AR at 62.)  On the contrary, Dr. Conditt administered four tests to Claimant.  He reported that Claimant (1) "wasn't able to repeat digits at all, either forward or backward," (2) "was only able to remember 1/3 items correctly upon delay, requiring a cue both times she was asked, (3) "was able to do simple arithmetic," and (4) gave "fine" answers to questions about similarities.  (*Id*. at 794.)  Although Dr. Conditt opined that during testing Claimant had "tremendous difficulty with attention and attention, probably due to chronic pain plus side effects of medications," these were his contemporaneous clinical observations made during Claimant's performance on the tests he administered, not his recitation of Claimant's medical or symptom history.  Even when

_____

[10] The ALJ, himself, found that Claimant "developed symptoms of depression secondary to pain."  (AR at 61 (citing Dr. Conditt's opinion, which indicates that the ALJ adopted Dr. Conditt's finding that Claimant's physical impairments contribute to her mental impairments and which undermines the ALJ's apparent blanket disregard of Dr. Conditt's recognition of the interaction between Claimant's pain and her mental impairments).)

Claimant expounded and told Dr. Conditt that her husband and daughter accused her of repeating herself "a lot," Dr. Conditt noted that it "was quite evident today. In fact, she repeated the fact that she repeats herself numerous times." (*Id.*) Thus, this independent corroboration provides support for Dr. Conditt's opinion number 3. (*Id.* at 795.) This same evidence also supports Dr. Conditt's opinions 1 and 2. In addition, the results of Dr. Conditt's testing support his opinions 1 and 2. Thus, the reasons the ALJ gave for the weight assigned to Dr. Conditt's opinion were without merit and remand is required for the ALJ to properly weigh this opinion.

Notwithstanding the above, the Commissioner argues that Dr. Conditt's opinion is not supported by the opinions of the state agency consultants who reviewed Claimant's records, including Dr. Conditt's report, and stated that Claimant "had no significant limits maintaining attention and concentration even for extended periods (Tr. 125). [Consulting psychologist Jennifer Wigton, Ph.D.] concluded that plaintiff's abilities were tied to her motivation, not a mental disorder (Tr. 126). In February 2017, Jonathan Brandon, Ph.D., another reviewing psychologist, agreed with Dr. Wigton (Tr. 159, 165-66)." (Doc. 13 at 14-15.) Claimant responds that Dr. Conditt's opinion is consistent with the opinions of the state agency consultants because the consultants found she "may struggle with concentration and pace according to variability of her mood, but is capable of performing 3-4 step tasks in a routine environment when motivated to do so." (AR at 185.) Claimant also argues that the opinions of consulting physicians who never examined Claimant would "ordinarily not amount to substantial evidence in the face of Dr. Conditt's reasoned and supported examining source opinions." (Doc. 14 at 5) (citing *Nevland v. Apfel*, 204 F.3d at 853, 858 (8th Cir. 2000).)

The consulting psychologists noted the dearth of evidence related to Claimant's mental impairments prior to Dr. Conditt's consulting examination. (AR at 126.) In addition, the ALJ cited mental health screenings that yielded normal results done when

29

Claimant attended physicians' appointments to address physical ailments. (*Id.* at 61.) Claimant cites no treatment notes that support Dr. Conditt's opinions. On remand, the ALJ must reweigh this evidence when considering how much weight to assign Dr. Conditt's opinion. 20 C.F.R. § 404.1527(c)(4). ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight [the ALJ] will give to that medical opinion.")

**C.**    ***The ALJ did not properly evaluate Claimant's subjective complaints.***

When a claimant suffers from a severe impairment, but the impairment does not meet or equal a disabling impairment listed in the regulations, the ALJ "will consider the impact of [the claimant's] impairment(s) and any related symptoms, including pain, on [the claimant's] residual functional capacity." 20 C.F.R. § 404.1529(d)(4). This determination involves a two-step process in which the ALJ first decides whether the claimant has a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms and then evaluates the intensity and persistence of the claimant's symptoms. *Id.* § 404.1529(b),(c). When evaluating the claimant's subjective complaints during the second step, the ALJ considers the objective medical evidence, the claimant's work history, and evidence relating to the following factors ("the *Polaski* factors"): (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) [the claimant's] functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); 20 C.F.R. § 404.1529(c)(3).[11] An ALJ is not required to methodically discuss each *Polaski* factor as long as the ALJ "acknowledge[es]

---

[11] The Code of Federal Regulations includes the additional factors of: (1) other treatment the claimant receives for pain relief; and (2) measures the claimant uses to relieve pain "(e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.)." 20 C.F.R. § 404.1529(c)(3)(v), (vi).

and examin[es] those considerations before discounting [a claimant's] subjective complaints." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (*citing Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)).

After considering the factors and evidence, the ALJ determines the extent to which the claimant's symptoms affect the claimant's capacity to perform basic work activities. *Id.* § 404.1529(c)(4). The claimant's "symptoms, including pain, will be determined to diminish [the claimant's] capacity for basic work activities to the extent that [the claimant's] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id.*

Claimant argues that the ALJ did not properly evaluate her subjective complaints of pain. Specifically, Claimant argues that the ALJ did not properly evaluate her daily activities and the objective medical evidence in the case, and that her "claimed limitations should have been included in the ALJ's RFC, or at least, the ALJ should have provided good reasons for not including those limitations in the RFC." (Doc. 12 at 14-16; Doc. 14 at 5.)

### 1.    *Daily Activities*

The ALJ stated that "[t]he claimant described activities of daily living that are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (AR at 62-63.) When addressing Claimant's mental impairments at step three, the ALJ cited Claimant's January 17, 2017 adult function report and noted that Claimant

> helped care for her daughter as well as her dog. The claimant could perform a variety of household chores such as sweeping the kitchen, light dusting, light vacuuming, folding laundry, making her bed, and doing dishes by sitting on a stool. She could drive a car. In addition, the claimant could handle all of her own finances including paying bills, counting change,

using a checkbook and handling a savings account, but she noted that she
sometimes forgot to pay bills.

(*Id.* at 59 (internal citations omitted).) This is the only mention of Claimant's daily
activities in the ALJ's decision. When the ALJ analyzed the *Polaski* factors, he gave only
the single-sentence explanation quoted above.

Claimant asserts that the ALJ erred by not explaining which of her activities "were
inconsistent with her reported limitations." (Doc. 12 at 13.) Claimant avers that
evaluating daily activities is "especially problematic in the context of fibromyalgia which
is expected to cause good days and bad days and variability of symptoms." (*Id.* (citing
*Brosnahan v. Barnhart*, 336 F.3d 671, 677 (8th Cir. 2003).) Claimant cites her June 27,
2016 adult function report and argues the following:

> [S]he often took breaks when attempting basic chores. She reported
> difficulty shopping. She reported she had given up hobbies such as playing
> basketball, sewing and riding bicycles. She reported she did not go to family
> members [sic] houses because riding in cars bothered her. She explained
> she used a shower chair. There is nothing apparently inconsistent between
> Ms. Heins' reported activities and her claimed limitations.

(Doc. 12 at 13-14 (internal citations omitted).)

Claimant's mother and husband submitted statements in support of Claimant's
application stating that Claimant's physical condition deteriorated markedly between 2015
and 2017 and that Claimant had difficulty with household chores, shopping, and leisure
activities such as riding a motorcycle. (AR 401-04.) The ALJ did not mention Claimant's
husband's statement. However, this did not mean he did not consider the statement. The
ALJ was not required to cite every piece of evidence in the record. *See Wildman v.
Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (citing *Black v. Apfel*, 143 F.3d 383, 386 (8th
Cir. 1998)). "[A]n ALJ's failure to cite specific evidence does not indicate that such
evidence was not considered." *Id.*

To the extent the ALJ relied on his analysis of daily activities mentioned at step three to support his analysis of daily activities related to subjective complaints, I find that the record supports the ALJ's conclusion that Claimant can engage in sedentary work. Although Claimant's mother stated that Claimant uses "the store cart" when she shops (AR at 401) and Claimant stated that sometimes she sits and lets her husband or daughter fetch the groceries because she has a hard time standing or pushing the cart (*Id.* at 333), limiting Claimant to sedentary work accommodated these limitations. Claimant does not carry baskets of laundry up and down stairs. However, her RFC, which limits her to sedentary work, defined as work that involves lifting "no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools," 20 C.F.R. § 404.1567(a), does not require Claimant to carry anything as heavy as a full basket of laundry. Sedentary work does not implicate the kind of exertional levels playing basketball or riding bicycles does and also likely negates the need for breaks Claimant stated she takes when vacuuming, sweeping, and dusting.[12] The Court may not disturb an ALJ's decision merely because evidence in the record could support the opposite conclusion. *Moore*, 572 F.3d at 522. Therefore, the District Court should affirm the ALJ's decision on this issue.

### 2. *Objective Medical Evidence*[13]

The ALJ stated "[t]he claimant also alleged that she was limited due to fibromyalgia; however, it did not appear that the claimant was properly diagnosed with a tender point examination." (AR at 59.) Claimant argues that the ALJ "overlooked" her fibromyalgia diagnosis based on a trigger point examination in the record. Claimant

---

[12] Although Claimant stated that she no longer sews, she did not explain how her impairments interfere with her ability to sew. (AR at 334.)

[13] Although the objective medical evidence is not a *Polaski* factor, it is traditionally analyzed with the *Polaski* factors.

raised this issue in her appeal to the Appeals Counsel. (AR at 420-21.) Claimant avers that it is "well known in the Eighth Circuit as well as others, fibromyalgia presents difficulties in evaluating the objective medical evidence, as the traditional exam findings (beyond tender points) are lacking." (Doc. 12 at 13.) Claimant states that she received "many epidural steroid and other injections during the relevant period through when the Appeals Council denied review, and there is not a gap between [her] pain complaints and her seeking of treatment for her pain." (*Id.* (citing AR 31, 42, 592-93, 552, 555, 913).) Claimant continues, "Concerning the ALJ's claimed weaknesses in the objective medical evidence concerning [her] other physical impairments, these are largely explained by her fibromyalgia as well as the interaction between her depression and her pain." (*Id.* (citing AR 1025).)

The Commissioner responds that the ALJ's decision on this issue is supported by the record as a whole and states that "Claimant reads select sentences of the ALJ's decision in isolation from each other," when the Court "should examine the ALJ's decision in its entirety." (Doc. 13 at 15.) The Commissioner admits that Dr. Krain performed a trigger point examination for fibromyalgia, but asserts that the ALJ's failure to acknowledge the examination did "not amount to a harmful error" because Dr. Krain also "recorded in great detail" Claimant's "excellent physical abilities." (*Id.* at 17 (citing AR at 900-01).) The Commissioner argues that Claimant has the burden to show that the ALJ would have decided differently absent the error, and Claimant cannot meet this burden because Claimant's strength; coordination; gait; balance; stance; reflexes; and range of motion in her neck, hands, and knees were normal at this appointment. (*Id.* at 17-18.) The Commissioner also cites to the administrative record where the ALJ compared Claimant's complaints to the medical evidence to demonstrate that the ALJ's decision is supported by the record as a whole. (*Id.* at 15-17.)

Claimant complained of numbness in her extremities and that she sometimes could not move her right arm. (AR at 61, 89, 91-92.) However, as the ALJ pointed out, an EMG and MRI were both normal, except for "mild arthritic changes [not] related to [Claimant's] pain." (*Id.* at 61 (citing AR at 915, 1027).) The ALJ also noted that Claimant was described as "very histrionic" by Dr. Kurt A. House, who stated she "move[d] better with animation during stories." (*Id.* (citing AR 944).) At that same appointment, Claimant reported that she had recently fallen and Dr. House noted some bruising on Claimant's low to mid back, limited flexion and extension, and tenderness to her lumbar. (*Id.*) Dr. House diagnosed a lumbar contusion and prescribed tramadol and ice. (*Id.*)

Claimant's citations to treatment notes during the administrative process and her statement that there was no gap in treatment are a bit off base because the ALJ never said Claimant had gaps in her treatment. Most of the treatment notes cited by Claimant document injections Claimant received in her lumber spine in 2016 and 2018. (*Id.* at 31, 42, 552, 555, 592.) AR 1025 is a February 16, 2017 treatment note wherein Dr. Krain states that in spite of having normal MRI results, Claimant was "still troubled by numbness and tingling in her feet and hands . . . . She is convinced that something is causing it. She remains very frustrated by not knowing the cause. I again told her it is fibromyalgia, but she would like another opinion at UIHC neurology clinic."

The ALJ acknowledged that Claimant had pain in her right shoulder, back, and right knee. (*Id.* at 61-62.) He also evaluated Claimant's migraines and depression. (*Id.* at 61.) The ALJ noted that MRIs of Claimant's shoulder and cervical spine showed only "mild degenerative changes" and mild disc bulges in her lower back. (AR at 60-61 (citing AR at 483, 558, 983).) A September 2016 lumbar spine MRI confirmed that Claimant's lower back was "grossly stable compared to her March 2016 MRI." (*Id.* at 61, 750.) Claimant's shoulder MRI showed only a small peripheral partial intrasubstance

rim rent tear of the supraspinatus tendon, but no through and through tear. (*Id.* at 483.) In May 2017, Claimant had full range of motion in her right shoulder and 5/5 cuff strength. (*Id.* at 61, 1011.) Her February 2017 cervical spine MRI showed mild/moderate right side neural foraminal narrowing at the C6-C7 level. (*Id.*)

The ALJ discussed Claimant's treatment for right knee pain, including cortisone shots and arthroscopy of the right knee with partial medial meniscectomy and curettage of a large patella cyst. (*Id.* at 61.) Claimant's postoperative reports confirmed that her range of motion "looked very good, and her strength and function had improved." (*Id.* (citing AR at 825).) She was discharged from therapy at that time because she had "good functional use of the knee following surgery." (*Id.*) Six weeks prior to her discharge from therapy, Claimant reported to her physical therapist, "[T]he knee is getting along pretty well." (*Id.* at 841.) Claimant had done "a lot of walking [and] a bit of shopping" the previous day. (*Id.*) The ALJ cited these rehabilitation notes. (*Id.* at 61.) As the ALJ noted, five months after being released from therapy, Claimant had full range of motion and 5/5 quad strength in her right knee. (*Id.* at 61 (citing AR at 1011).).

The ALJ acknowledged Claimant's migraines, her migraine triggers, and that she was offered Botox therapy, which she declined due to the cost. (*Id.* at 61 (citing AR at 897).) He also discussed Claimant's depression, which she developed "secondary to pain." (*Id.*) The ALJ stated that Claimant's mental status examinations were normal. (*Id.* (citing AR 957, 996, 1014).) He also noted that a depression screening was negative and Claimant denied feeling "down, depressed or hopeless." (*Id.* (citing AR 908, 910).)

Absent Claimant's confirmed fibromyalgia diagnosis, the ALJ would have properly analyzed the objective medical evidence in this case. In fact, Claimant does not even raise colorable objections to the ALJ's valuation of this evidence. However, as the Commissioner concedes, the ALJ missed Claimant's fibromyalgia diagnosis. The only reason the ALJ rejected the diagnosis was his perceived lack of a tender point

examination, not a lack of overall pain symptoms.[14]  (*Id.* at 58.)  Since Claimant has a tender point diagnosis of fibromyalgia that was possibly causing some of the pain that was not explained by objective testing (*Id.* at 1025, 1043), remand is required for the ALJ to consider the objective medical evidence in light of that diagnosis.  *See Brosnahan v. Barnhart*, 336 F.3d 671, 678 (8th Cir. 2003) ("Brosnahan's testimony and reports to the SSA are supported by objective medical evidence of fibromyalgia—consistent trigger-point findings—and by her consistent complaints during her relatively frequent physicians' visits of variable and unpredictable pain, stiffness, fatigue, and ability to function.).

The administrative record documents Claimant's quest for pain relief (*e.g.*, AR 562, 612-15, 895, 909, 1025), in addition to statements from Claimant and her attorney that explain Claimant only stands, sits, or walks for limited periods of time before having to switch positions; she experiences numbness in her extremities; pain interferes with her sleep; depression interferes with her ability to focus;[15] and medication does not control her pain. (AR at 363, 376-77, 388.)  Claimant's mother and husband also state that Claimant's pain has changed Claimant's life in many ways: Claimant can no longer do household chores or errands alone or ride motorcycles with her husband.  (*Id.* at 401-04.)  Dr. Conditt stated that Claimant "hobbled" into her examination and was hunched over due to pain. (*Id.* at 793.)  Claimant testified that she has migraines, shoulder pain, knee pain, and back pain that is not relieved by various treatments, including injections. (*Id.* at 86-90, 94-97.)  The ALJ dismissed Claimant's allegations of pain because "the objective findings in this case fail to provide strong support for the claimant's allegations

---

[14] Tender point testing is no longer required to diagnose fibromyalgia.  *See* SSR 12-2p (explaining the 1990 and 2010 criteria for evaluating claims based on fibromyalgia).

[15] Depression is one of the "six or more fibromyalgia symptoms, signs, or co-occurring conditions" considered in the second of three criteria under the 2010 criteria for evaluating claims based on fibromyalgia.  *Id.*

of disabling limitations." The ALJ must reassess the evidence in this case with an eye towards fibromyalgia since tender point findings and consistent complaints of pain constitute objective medical evidence of fibromyalgia. *See Brosnahan*, 336 F.3d at 678. On remand, the ALJ should be guided by the following principles:

> The Courts have advised that, "given the nature of fibromyalgia, where subjective pain complaints play an important role in the diagnosis and treatment of the condition, providing justification for discounting a claimant's statements is particularly important." *Rogers v. Commissioner of Social Security,* 486 F.3d 234, 248 (6th Cir. 2007) (noting that "the nature of fibromyalgia itself renders such a brief analysis and over-emphasis upon objective findings inappropriate."); *Tilley v. Astrue,* 580 F.3d 675, 681 (8th Cir. 2009) ("Fibromyalgia is an elusive diagnosis; '[i]ts cause or causes are unknown, there's no cure, and, of greatest importance to disability law, its symptoms are entirely subjective.'"), quoting *Sarchet v. Chater,* 78 F.3d 305, 306 (7th Cir. 1996); *Swain v. Commissioner of Social Security,* 297 F. Supp. 2d 986, 990 (N.D. Ohio 2003) ("There is no laboratory test for the disease's presence or severity," and "[p]hysical examinations usually yield normal findings in terms of full range of motion, no joint swelling, normal muscle strength, and normal neurological reactions.")[citations omitted]; *Moore v. Barnhart,* 405 F.3d 1208, 1211 (11th Cir. 2005) (the hallmark of fibromyalgia is a lack of objective evidence); *Garza v. Barnhart,* supra at 1089 (fibromyalgia is difficult to diagnose, chronic, and may be disabling).

*Moraine v. Soc. Sec. Admin.*, 695 F. Supp. 2d 925, 959 (D. Minn. 2010). I recommend the District Court remand the case for the ALJ to reconsider the objective medical evidence in light of Claimant's fibromyalgia diagnosis.[16]

---

[16] While I find that while the ALJ did not do an in-depth analysis of the other *Polaski* factors, his decision indicates that he at least considered the other factors when evaluating Claimant's case. I therefore find no error in the ALJ's evaluation of any other *Polaski* factor.

**D.     The ALJ was appointed in a constitutional manner.**

In *Lucia v. SEC*, the Supreme Court held that ALJs of the Securities and Exchange Commission are "Officers of the United States" within the meaning of the Appointments Clause, and, therefore, the President, a court of law, or department head must appoint them. 138 S. Ct. at 2049. Claimant argues that Social Security Administration ("SSA") ALJs should be treated as improperly appointed "inferior officers" like the SEC ALJs in *Lucia*. (Doc. 12 at 14-16.) Claimant asserts this Court should vacate the denial of benefits by ALJ Priester and remand the case for decision by what she contends is a properly-appointed ALJ. (*Id.* at 14.) Claimant admits she is asserting this Appointments Clause challenge for the first time in her brief to this Court. (Doc. 14 at 5-7.)[17]

Claimant argues that her case presents a difference from most of the other cases that I have previously addressed. In July 2018, while Claimant's case was in the administrative process, then-Acting Commissioner of Social Security Berryhill reappointed all Social Security ALJs. (*Id.* at 15.) Claimant argues that Ms. Berryhill had no power to appoint the ALJs because "the Federal Vacancies Reform Act as it relates to temporary Department Heads may only be constitutional as it relates to temporary appointments, since a principal officer requires Senate confirmation." (*Id.* at 16 (citing *United States v. Eaton*, 169 U.S. 331, 343 (1898).) Claimant argues that Ms. Berryhill was an inferior officer who did not have the power to appoint other inferior officers, in this case, ALJs. (*Id.* at 16-17 (citing *NLRB v. SW Gen., Inc.* 137 S. Ct. 929, 946 (2017) (Thomas, J., concurring)).) Claimant also asserts that in the absence of clear authority from the Eighth Circuit, the Court should rely on *Cirko ex rel Cirko v. Comm'r*

_____

[17] Claimant argued in her main brief that she raised her Appointments Clause argument on appeal to the Appeals Council. (Doc. 12 at 14.) This was apparently a typographical error because she did not raise this argument on administrative appeal. (AR at 1-3.) Claimant asserts her exhaustion argument in her reply brief (Doc. 14 at 5-10) and even alludes to it in her main brief (Doc. 12 at 14).

*of Soc. Sec.,* No. 19-1772, -- F.3d --, 2020 WL 370832 (3d Cir. Jan. 23, 2020) and remand the case for a new hearing in front of a different ALJ, even though the issue was not timely raised during the administrative process. (Doc. 14 at 9.)

> The Federal Vacancies Reform Act provides the following:
>
> (a) If an officer of an Executive agency . . . whose appointment to office is required to be made by the President, by and with the advice and consent of the Senate, dies, resigns, or is otherwise unable to perform the functions and duties of the office--
>
>> (1) the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity . . . .;
>>
>> (2) notwithstanding paragraph (1), the President (and only the President) may direct a person who serves in an office for which appointment is required to be made by the President, by and with the advice and consent of the Senate, to perform the functions and duties of the vacant office temporarily in an acting capacity. . .; or
>>
>> (3) notwithstanding paragraph (1), the President (and only the President) may direct an officer or employee of such Executive agency to perform the functions and duties of the vacant office temporarily in an acting capacity. . . .

5 U.S.C. § 3345. Thus, a plain reading of the Act gave Acting Commissioner Berryhill the authority to appoint ALJs because that is one of the "functions and duties" of the office she was fulfilling in her capacity as Acting Commissioner of Social Security.

In addition, the cases cited by Claimant are unhelpful to her argument. Claimant quotes *United States v. Eaton*, 169 U.S. 331, 334 (1898): "Because the subordinate officer is charged with the performance of the duty of the superior for a limited time and under special and temporary conditions, he is not thereby transformed into the superior and permanent official." (Doc. 12 at 16.) *Eaton* addressed the appointment of a Vice Consul to Siam who was appointed by the Consul to Siam to perform the duties of the Consul when the Consul became too ill to fulfill his duties and returned to the United States. 169 U.S. at 332-33. *Eaton* did not address the duties that a temporarily-appointed

inferior officer could perform. Rather, the case only addressed the time that a Vice Consul performed the duties of Consul, rather than the nature of the duties they were allowed to perform.

> Although section 2 of article 2 of the constitution requires consuls to be appointed by the president 'by and with the advice and consent of the senate,' the word 'consul' therein does not embrace a subordinate and temporary officer like that of vice consul, as defined in the statute. The appointment of such an officer is within the grant of power expressed in the same section, saying: 'But the congress may by law vest the appointment of such inferior officers, as they think proper, in the president alone, in the courts of law or in the heads of departments.' Because the subordinate officer is charged with the performance of the duty of the superior for a limited time, and under special and temporary conditions, he is not thereby transformed into the superior and permanent official. To so hold would render void any and every delegation of power to an inferior to perform under any circumstances or exigency the duties of a superior officer, and the discharge of administrative duties would be seriously hindered. The manifest purpose of congress in classifying and defining the grades of consular offices, in the statute to which we have referred, was to so limit the period of duty to be performed by the vice consuls, and thereby to deprive them of the character of 'consuls,' in the broader and more permanent sense of that word.

*Id.* at 343. Therefore, nothing in *Eaton* prevented Ms. Berryhill from performing all the duties of the Commissioner while acting in that capacity. *Eaton* states that during the time the Vice Consul served as Consul, he was "charged with the performance of the duty of the superior," just as Ms. Berryhill was so charged in this case. Furthermore, the *Eaton* Court reasoned that the rule allowing for the appointment of a Vice Consul under the circumstances presented in the case served the public interest and prevented closure of the consular office. *Id.* at 342-43. Similar goals are served here. If Ms. Berryhill was not authorized to ratify the appointments of sitting ALJs after *Lucia*, and her replacement was not yet nominated by the President and approved by the Senate,

"evil consequences" would result. *Id.* at 342. All the work of the SSA would effectively be open to Appointments Clause challenges. This is an absurd result.

Likewise, *Morrison v. Olson*, 487 U.S. 654 (1988) is not on point. *Morrison* addressed whether the independent counsel provisions of the Ethics in Government Act violated the Appointments Clause. 487 U.S. at 659-60. The Court held that special counsel were "'inferior officers' in the constitutional sense" due to the fact that the role is "restricted primarily to investigation and, if appropriate, prosecution for certain federal crimes." *Id.* at 671-72. The Court recognized that special counsel were given full power and independent authority "to exercise all investigative and prosecutorial functions and powers of the Department of Justice," but only within the scope of the jurisdiction granted and not with the power to formulate policy. *Id.* In the case at bar, Claimant proffers no evidence indicating that Ms. Berryhill's authority was so limited during her tenure as Acting Commissioner. Rather, it appears that Ms. Berryhill was fulfilling all the duties of the Commissioner while in that role.[18]

---

[18] Ms. Berryhill actually held the title of Acting Commissioner of Social Security twice. She first assumed the role on January 21, 2017. Mar. 6, 2018 letter from GAO Gen. Counsel Thomas H. Armstrong to Pres. Trump, https://www.gao.gov/assets/700/690502.pdf. On March 6, 2018, the GAO determined that her term should have ended on November 17, 2017 in accordance with the FVRA. *Id.* Immediately following the GAO's notification in March 2018, Ms. Berryhill "stepped down from her role as Acting Commissioner and continued to lead the agency from her Deputy Commissioner of Operations position of record. . . . . [H]owever, on April 17, 2018, the President nominated Mr. Andrew Saul to be the next Commissioner of Social Security. . . . The FVRA contains a 'spring-back' provision that enabled Berryhill to resume her role as Acting Commissioner as of the date of Mr. Saul's nomination." *Patterson v. Berryhill*, No. 2:18-CV-00193, 2018 WL 8367459, at *1 (W.D. Pa. June 14, 2018) (citing 5 U.S.C. § 3346(a)(2) (providing that, once a first or second nomination for the office is submitted to the Senate, an acting officer may serve from the date of such nomination for the period the nomination is pending in the Senate)) (internal citations omitted). As discussed above, it is my view that Ms. Berryhill had the power to fulfill all the duties of the Commissioner while holding that title. To the extent Claimant is pursuing some sort of "lapse or gap in authority" argument for the time Ms. Berryhill led the agency as Deputy Commissioner of Operations even though the act she takes issue with in this case was performed when Ms. Berryhill had the title of Acting

Claimant also cites *NLRB v. SW Gen., Inc.*, where Justice Thomas wrote separately "to explain [his] view that the Appointments Clause likely prohibited [NLRB's general Counsel's] appointment." 137 S. Ct. 929, 945 (2017) (Thomas, J., concurring). However, the portion of the concurrence quoted by Claimant addresses an issue the majority did not address and is not binding. *Id.* at 946 ("The dissent's conclusion that the FVRA authorized the appointment in this case . . . implicates an important constitutional question that the Court's interpretation does not: Whether directing Lafe Solomon to serve as acting general counsel of the National Labor Relations Board . . . without the advice and consent of the Senate, complied with the Constitution. I write separately to explain my view that the Appointments Clause likely prohibited Solomon's appointment.").

None of the cases cited by Claimant addressed challenges to the appointments of inferior officers by temporarily-appointed officers. Therefore, Claimant's arguments do not convince me that this case requires remand based on Ms. Berryhill's status at the time she reappointed ALJ Priester.[19] Thus, none of Claimant's arguments convince me that the unique posture of this case requires remand. Moreover, Claimant failed to raise any of her arguments during the administrative process.

In support of her general argument that exhaustion is not required, Claimant cites SSR 19-1p, 2019 WL 1202036, Effect of the Decision in *Lucia v. Securities and*

_____

Commissioner, I find that Ms. Berryhill had full authority to carry out all the Commissioner's duties at that time, too. *See* Providing an Order of Succession Within the Social Security Administration, 81 FR 96337, 2016 WL 7487744 ("[T]he following officials of the Social Security Administration, in the order listed, shall act as and perform the functions and duties of the office of the Commissioner of Social Security (Commissioner), during any period in which both the Commissioner and Deputy Commissioner of Social Security have died, resigned, or become otherwise unable to perform the functions and duties of the office of Commissioner").

[19] I am not sure what Claimant would have had Ms. Berryhill do other than re-appoint the SSA ALJs with *Lucia* as precedent and no permanent successor ready to take office.

*Exchange Commission* on Cases Pending at the Appeals Council.  (Doc. 12 at 14.)

However, SSR 19-1p is inapplicable to Claimant's case because the ruling only applies

to challenges timely raised before the Appeals Council or previously raised at the ALJ

level.   2019 WL 1202036, at *9583; *see also Murphy*, 2019 WL 2372896, at *7

(addressing SSR 19-1p and holding that claimant waived *Lucia* issue when she raised it

for the first time in the district court).

Claimant again cites *Cirko*, 2020 WL 370832, at * 6, and encourages the Court to

adopt its reasoning regarding the number of cases that would be affected if remand were

allowed when Appointments Clause challenges are not raised at the administrative level.

(Doc. 14 at 9.)  I respectfully decline to do so, and instead adopt the reasoning of the

Court in the recent decision in *Griffin v. Comm'r of Soc. Sec.*:

> [I]n *Ramazetti v. Comm'r of Soc. Sec.*, No. 8:19-cv-260-T-MAP, 2020 WL
> 428950 (M.D. Fla. Jan. 28, 2020), the district court determined that the
> claimant's Appointments Clause challenge failed because the claimant
> waived the issue by not raising it before the ALJ or Appeals Council. *See
> id*. at *8. Further, the district court stated that "[t]he Supreme Court in
> *Lucia* did not make a blanket finding that all ALJs are subject to the
> Appointments Clause, just that SEC ALJs are so subject." *Id*. The district
> court points out that, "[a]t the time the Supreme Court decided *Lucia*, the
> SEC had only five ALJs. . . . In contrast, there are currently over 1,700
> Social Security Administration ALJs." *Id*. The district court also notes that
> "[t]he Social Security Administration annually receives about 2.6 million
> initial disability claims and completes about 689,500 ALJ hearings; in 2018,
> it took an average 809 days to process a claim from its initial receipt to an
> ALJ decision, with more than 850,000 people waiting for ALJ hearings."
> *Id*. The district court concluded that "[i]f courts were to apply *Lucia* to
> Social Security cases as Plaintiff argues this [c]ourt should, millions of cases
> would need [to] be remanded for rehearing by a different ALJ. Given these
> important efficiency concerns and the Supreme Court's specific findings in
> *Lucia*, the [c]ourt is skeptical that *Lucia* is even controlling as to Social
> Security Administration ALJs." *Id*. (quoting *Miaolino v. Comm'r of Soc.
> Sec.*, No. 2:18-cv-494-FtM-UAM, 2019 WL 2724020 (M.D. Fla. July 1,
> 2019)).

No. 18-CV-85-LRR, 2020 WL 733886, at *10 (N.D. Iowa Feb. 13, 2020) (all alterations except first set of brackets in original).

This Court has ruled in favor of the Commissioner on similar claims on several occasions. *See Hall v. Saul*, No. 18-CV-2032-LTS-KEM, 2019 WL 5085427, at *16 (N.D. Iowa Oct. 10, 2019); *Gilbert v. Saul*, No. C18-2045-LTS, 2019 WL 4751552, at *20 (N.D. Iowa Sept. 30, 2019); *Squier v. Saul*, No. 18-CV-3026-LTS, 2019 WL 4696415, at *10 (N.D. Iowa Sept. 26, 2019); *Rollie v. Saul*, No. 18-CV-129-CJW-KEM, 2019 WL 4673220, at *10 (N.D. Iowa Sept. 25, 2019); *Dewbre v. Comm'r of Soc. Sec.*, No. 18-CV-4055-LRR, 2019 WL 4344288, at *6 (N.D. Iowa Sept. 12, 2019); *Sexton v. Saul*, No. C18-1024-LTS, 2019 WL 3845379, at *8 (N.D. Iowa Aug. 15, 2019); *Frazer v. Saul*, No. C18-2015-LTS, 2019 WL 3776996, at *4 (N.D. Iowa Aug. 12, 2019); *Murphy*, 2019 WL 2372896, at *7; *White v. Comm'r of Soc. Sec.*, No. C18-2005-LTS, 2019 WL 1239852, at *4 (N.D. Iowa Mar. 18, 2019); *Stearns v. Berryhill*, No. 17-CV-2031-LTS, 2018 WL 4380984, at *6 (N.D. Iowa Sept.14, 2018); *Davis v. Comm'r of Soc. Sec.*, No. 17-CV-80-LRR, 2018 WL 4300505, at *8-9 (N.D. Iowa Sept. 10, 2018); *Iwan v. Comm'r of Soc. Sec.*, No. 17-CV-97-LRR, 2018 WL 4295202, at *9 (N.D. Iowa Sept. 10, 2018); *Thurman v. Comm'r of Soc. Sec.*, No. 17-CV-35-LRR, 2018 WL 4300504, at *9 (N.D. Iowa Sept. 10, 2018).

Finally, Claimant asks the Court to stay its decision on this issue pending the Eighth Circuit's resolution of the issue. (Doc. 12 at 15; Doc. 14 at 6 n.1 (citing *Marant v. Saul*, No. 18-cv-4832, 2019 WL 6682140, at **3-4 (E.D. Pa. Dec. 6, 2019)). In addition to the precedent cited by Claimant, I am also aware of the Honorable Rebecca Goodgame Ebinger's decision to stay her decision on this issue pending the Eighth Circuit's decision. Order at 5, *Harwell v. Saul*, No. 4:18-cv-00296-RGE-HCA (S.D. Iowa Mar. 2, 2020) (Doc. 24). In making my recommendation, I respectfully decline to follow these decisions. *See* Order at 12-13, *Dewbre v. Comm'r, Soc. Sec.*, No. 18-cv-

4055-LRR-KEM (N.D. Iowa Sept. 12, 2019) (Doc. No. 17). I do not recommend granting a stay in this case.

However, because I recommend that Claimant's request for remand should be granted on other grounds, Claimant should be permitted to assert this objection on remand. *See Weatherman v. Berryhill*, No. 5:18-CV-00045-MOC, 2018 WL 6492957, at *4 (W.D.N.C. Dec. 10, 2018); *Mann v. Berryhill*, No. 4:18-CV-3022, 2018 WL 6421725, at *8 (D. Neb. Dec. 6, 2018); *Clayton C. v. Comm'r of Soc. Sec.*, No. C18-638 BHS-BAT, 2018 WL 5985255, at *4 (W.D. Wash. Oct. 16, 2018), *R. & R. adopted sub nom, Christianson v. Berryhill*, 2018 WL 5962899 (Nov. 14, 2018). Relying on *Mann*, this Court has noted, "[O]n remand, a claimant may challenge an ALJ's appointment because Appointments Clause challenges are deemed to be in the category of nonjurisdictional structural constitutional objections that could be considered on appeal whether or not they were ruled upon below." *Anderson v. Comm'r of Soc. Sec.*, No. 18-CV-24-LRR, 2019 WL 1212127, at *5 (N.D. Iowa Feb. 19, 2019) (internal quotations omitted). If, however, the District Court declines to remand the case, this argument should be deemed waived.

## IV. CONCLUSION

For the foregoing reasons, I respectfully recommend that the District Court **affirm in part and reverse and remand in part** the decision of the ALJ. The case should be remanded for the ALJ to:

- Obtain vocational expert testimony regarding the apparent unresolved conflict between the RFC's reaching limitation and the jobs of document preparer and addresser;
- Resolve the apparent conflict between Claimant's mental limitations and reasoning level 3 jobs;
- Resolve the apparent conflict regarding the number of appropriate jobs available to Claimant in the national economy;
- Reweigh Dr. Conditt's opinion; and

- Evaluate the objective medical evidence in light of Claimant's fibromyalgia diagnosis.
- If the District Court remands the case for other reasons, Claimant should be allowed to assert her Appointment Clause challenge on remand.

The parties must file objections to this Report and Recommendation within fourteen (14) days of the service of a copy of this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the District Court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** this 11th day of June, 2020.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa

47